SHEET METAL WORKERS NATIONAL
HEALTH FUND, individually and on behalf of
all others similarly situated,

Plaintiff,

v.

AMGEN INC. and AMGEN USA INC.,

Defendants.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CIV. ACTION NO. 07-05295 (SRC-MAS)

*Document Electronically Filed*

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

---

GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500
Attorneys for Defendants Amgen Inc. and
Amgen USA Inc.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT.......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

LEGAL ARGUMENT......................................................................................................... 5

POINT I ........................................................................................................................... 5

SMW HEALTH FUND LACKS STANDING ........................................................ 5

A.    Plaintiff's Antitrust Claims For Damages Should Be Dismissed For
Failure Sufficiently To Plead Injury-In-Fact. ......................................... 5

1.    SMW Health Fund Has Not Pled That Prices For The Combination
Of Products Are Higher In The Aggregate Than They Would Be
Absent the Bundle. ..................................................................................... 7

2.    Plaintiff Has Not Pled Facts Supporting Its Conclusory Allegation
That RBCGF Prices Are Higher As A Result Of The Bundle................ 11

B.    Plaintiff's Claim For Injunctive Relief Under § 16 Of The Clayton Act
Should Be Dismissed For Failure Sufficiently To Plead A Substantial
Threat Of Injury-In-Fact...................................................................... 12

C.    Even if SMW Health Fund Had Alleged Injury-In-Fact, Its Injury Is Too
Indirect And Too Remote To Confer Antitrust Standing. ..................... 13

1.    SMW Health Fund's Damages Claims under Florida, Louisiana,
Massachusetts and New Jersey Law Should Be Dismissed Because
These State Antitrust Laws Do Not Recognize Indirect Purchaser
Standing. ................................................................................................. 14

2.    Plaintiff Is Too Far Removed From The Challenged Conduct To
Have Antitrust Standing to Assert Damage Claims Under the
Remaining State Antitrust Laws Invoked in the Complaint ................... 14

3.    SMW Health Fund Lacks Standing to Assert State Antitrust
Claims Because It Has Failed to Allege that It Has Made a
Reimbursement in Each State................................................................. 19

POINT II ....................................................................................................................... 20

THE COMPLAINT DOES NOT STATE A CLAIM FOR MONOPOLIZATION
BECAUSE PLAINTIFF HAS NOT ALLEGED THAT AMGEN HAS
MONOPOLY POWER IN THE ALLEGED RELEVANT MARKET. ........................ 20

POINT III ...................................................................................................................... 24

PLAINTIFF'S TYING CLAIM FAILS AS A MATTER OF LAW BECAUSE
AMGEN DOES NOT SELL ITS WBCGF PRODUCTS ONLY ON
CONDITION THAT THE ONCOLOGY CLINICS BUY ARANESP®. ..................... 24

## TABLE OF CONTENTS
(continued)

**Page**

POINT IV ..................................................................................................................28

    PLAINTIFFS MAY NOT PURSUE CLAIMS BASED ON INTERSTATE
    ACTIVITY UNDER CERTAIN STATE ANTITRUST LAWS. ...................................28

CONCLUSION ..........................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>CASES</u>

Al Copeland Enters. v. Jamplis,
No. 90-4902, 1991 WL 49651 (E.D. La. Apr. 3, 1991) ............................................. 29

American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'n, Inc.,
108 F.3d 1147 (9th Cir. 1997) ......................................................... 22

Andrx Pharms, Inc. v. Biovail Corp. Int'l,
256 F.3d 799 (D.C. Cir. 2001) ......................................................... 5

Anheuser-Busch, Inc. v. Abrams,
520 N.E.2d 535 (N.Y. 1988) ......................................................... 6

Anziulewicz v. Bluefield Cmty. Hosp., Inc.,
531 F. Supp. 49 (S.D. W.Va. 1981) ......................................................... 29

Associated General Contractors of Calif., Inc. v. California State Council of Carpenters,
459 U.S. 519 (1983) ......................................................... 14

Aurora Cable Communications, Inc. v. Jones Intercable, Inc.,
720 F. Supp. 600 (W.D. Mich. 1989) ......................................................... 29

Barr Labs., Inc. v. Abbott Labs., Inc.,
978 F.2d 98 (3d Cir.1992) ......................................................... 22

Beckler v. VISA USA, Inc.,
No. Civ. 09-04-C-00030,
2004 WL 2475100 (Sept. 21, 2004) ......................................................... 15

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007) ......................................................... passim

Blue Shield of Virginia v. McCready,
457 U.S. 465 (1982) ......................................................... 14

Broadcom Corp. v. Qualcomm Inc.,
2006 U.S. Dist. LEXIS 62090 (D.N.J. 2006),
rev'd on other grounds, 501 F.3d 297
(3d Cir. 2007) ......................................................... 25, 27

Burr v. Kulas,
564 N.W.2d 631 (N.D. 1997) ......................................................... 6

Cargill, Inc. v. Monfort of Colorado, Inc.,
479 U.S. 104 (1986) ......................................................... 12

Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.,
    529 N.W.2d 905 (Wis. 1995) ................................................................................... 6

Ciardi v. Hoffmann-LaRoche, Ltd.,
    762 N.E.2d 303 (Mass. 2002) ................................................................................ 14

City of Pittsburg v. West Penn Power Co.,
    147 F.3d 256 (3d Cir. 1998) ................................................................................... 5

Conley v. Gibson,
    355 U.S. 41 (1957) ................................................................................................ 11

Craftsman Limousine, Inc. v. Ford Motor Co.,
    491 F.3d 380 (8th Cir. 2007) ................................................................................ 23

Davric Maine Corp. v. Rancourt,
    216 F.3d 143 (1st Cir. 2000).................................................................................... 6

Duke v. Browning-Ferris Indus., Inc.,
    No. 96-2859-TUA, 1996 U.S. Dist. LEXIS 20769 (W.D. Tenn. Oct. 22, 1996) ..................... 29

English v. NCAA,
    439 So.2d 1218 (La. Ct. App. 1983) ..................................................................... 29

Free v. Abbott Labs.,
    176 F.3d 298 (5th Cir. 1999), aff'd, 529 U.S. 333 (2000)....................................... 14

Freeland v. A.T. & T. Corp.,
    238 F.R.D. 130 (S.D.N.Y. 2006) ............................................................................. 8

Freeman Industries LLC v. Eastman Chemical Co.,
    172 S.W.3d 512 (Tenn. 2005)................................................................................ 29

Fucile v. VISA USA, Inc.,
    No. S1560-03 CNC 2004 WL 3030037 (Vt. Super. 2004)..................................... 15

Grams v. Boss,
    294 N.W.2d 473 (Wis. 1980)................................................................................. 29

Griffin v. Dugger,
    823 F.2d 1476 (11th Cir. 1987) ............................................................................ 19

Handicomp v. USGA,
    2000 WL 426245 (3d Cir. 2000)........................................................................... 22

Ho v. VISA USA, Inc.,
    2004 NY Slip Op. 50415U, 3 Misc.3d 1105A (Sup. Ct., N.Y. County Apr. 21, 2004) .......... 15

Illinois Brick Co. v. Illinois,
    431 U.S. 720 (1977) ............................................................................................... 6

In re Ditropan XL Antitrust Litig.,
  2007 WL 1411617 (N.D. Cal. May 11, 2007) ........................................................................ 19

In re Dynamic Random Access Memory Antitrust Litig.,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ...................................................................... 15, 17

In re New Motor Vehicles Canadien Exp. Antitrust Litig.,
  235 F.R.D. 127 (D. Me. 2006) ...................................................................................... 15

In re Terazosin Hydrochloride Antitrust Litig.,
  160 F. Supp. 2d 1365 (S.D. Fla. 2001) ......................................................................... 19

Indiana Grocery, Inc. v. Super Valu Stores, Inc.,
  864 F.2d 1409 (7th Cir. 1989) ...................................................................................... 23

Kanne v. Visa USA,
  723 N.W.2d 293 (Neb. 2006) ....................................................................................... 15

Kypta v. McDonald's Corp.,
  671 F.2d 1282 (11th Cir.),
  cert. denied, 459 U.S. 857 (1982) ............................................................................. 8, 11

L. Knife & Son v. Banfi Prod. Corp. ,
  118 F.R.D. 269 (D. Mass. 1987) ..................................................................................... 8

Lamminen v. City of Cloquet,
  987 F. Supp. 723 (D. Minn. 1997) ................................................................................. 6

LePage's v. 3M,
  324 F.3d 141 (3d Cir. 2003) ...................................................................................... 9, 13

Lewis v. Casey,
  518 U.S. 343 (1996) ..................................................................................................... 19

Lockheed Martin Corp. v. Boeing,
  314 F. Supp. 2d 1198 (M.D. Fla. 2004) ...................................................................... 22

Lorix v. Crompton Corp.,
  736 N.W.2d 619 (Minn. 2007) ..................................................................................... 15

Lynch Display Corp. v. Nat'l Souvenir Ctr. Inc.,
  640 S.W.2d 837 (Tenn. Ct. App. 1982) ...................................................................... 29

Mack v. Bristol-Myers Squibb Co.,
  673 So.2d 100 (Fla. Dist. Ct. App. 1996) .................................................................... 14

Maio v. Aetna, Inc.,
  221 F.3d 472 (3d Cir. 2000) .......................................................................................... 5

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ............................................................................................ 10, 12

Max 100 L.C. v. Iowa Realty Co. Inc.,
    621 N.W.2d 178 (Iowa 2001) ............................................................................... 6

Monsanto Co. v. Spray-Rite Serv. Corp.,
    465 U. S. 752 (1984) ............................................................................................ 12

Morse v. Lower Merion Sch. Dist.,
    132 F.3d 902 (3d Cir. 1997) ................................................................................. 6

N.C. Steel, Inc. v. Nat'l. Council on Compensation Ins.,
    472 S.E.2d 578 (N.C. Ct. App. 1996) .................................................................. 6

Orr v. BHR, Inc.
    No. 00-3135, 2001 U.S. App. LEXIS 2391 (10th Cir. Feb. 16, 2001) ................ 6

Ortho Biotech Prods. v. Amgen Inc.,
    Civ. Act. No. 05-4859
    (D.N.J. Nov. 21, 2006) .................................................................................. passim

Pac. Ry. Co. v. United States,
    356 U.S. 1 (1958) ........................................................................................... 25, 26

Palumbo v. Graley's Body Shop, Inc.,
    425 S.E.2d 177 (W. Va. 1992) .............................................................................. 29

Peoples Savs. Bank v. Stoddard,
    102 N.W.2d 777 (Mich. 1960) .............................................................................. 29

Peterson v. VISA USA, Inc.,
    No. Civ. A. 03-8080,
    2005 WL 1403761 (D.C. Super. Apr. 22, 2005) ................................................... 15

Pulp Wood Co. v. Green Bay Paper & Fiber Co.,
    147 N.W. 1058 (Wis. 1914) ................................................................................. 29

Rebel Oil Co. v. Atlantic Richfield Co.,
    51 F.3d 1421 (9th Cir.), cert. denied, 516 U.S. 987 (1985) ................................. 23

Rockholt Furniture, Inc. v. Kincaid Furniture Co., Inc.,
    No. 1:96-CV-588, 1998 WL 1661384 (E.D. Tenn. July 6, 1998) ........................ 6

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000) ................................................................................... 17

Schor v. Abbott Labs., Inc.,
    457 F.3d 608 (7th Cir. 2006) ............................................................................... 25

Schuylkill Energy Resources v. Pennsylvania Power & Light Co.,
    113 F.3d 405 (3d Cir.), cert. denied, 522 U.S. 977 (1997) ...................................................... 21

Sickles v. Cabot Corp.,
    379 N.J. Super. 100 (App. Div.), certif. denied, 185 N.J. 297 (2005) ..................................... 14

Smith v. Milk Prods., LLC,
    No. 4:99-CV-21-B-A, 1999 U.S. Dist. LEXIS 9492 (N.D. Miss. June 1, 1999) ....................... 6

SmithKline Corp. v. Eli Lilly & Co.,
    427 F. Supp. 1089 (E.D. Pa. 1976),
    aff'd, 575 F.2d 1056 (3d Cir. 1978) .................................................................... 25, 27, 28

Southard v. Visa USA,
    734 N.W.2d 192 (Iowa 2007) ................................................................................ 15

Spectrum Sports, Inc. v. McQuillan,
    506 U.S. 447 (1993) ............................................................................................... 24

State v. Waste Mgmt.,
    261 N.W.2d 147 (Wis. 1978) .................................................................................. 29

T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.,
    931 F.2d 816 (11th Cir. 1991) ................................................................................ 22

Teague v. Bayer AG,
    No. 05 CVS 90, 2007 WL 2569668
    (N.C. Super. May 7, 2007)...................................................................................... 15

TruePosition Inc. v. Andrew Corp.,
    507 F. Supp.2d 447 (D. Del. 2007) ......................................................................... 10

United States v. Aluminum Co. of America,
    148 F.2d 416 (2d Cir. 1945) ................................................................................... 22

Verizon Communications Inc. v. Trinko,
    540 U.S. 398 (2004) ............................................................................................... 10

Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,
    127 S. Ct. 1069 (2007)........................................................................................... 10

Will v. Comprehensive Accounting,
    776 F.2d 665 (7th Cir. 1985) .................................................................................... 8

Zenith Radio Corp. v. Hazeltine Research, Inc.,
    395 U.S. 100 (1969) ......................................................................................... 10, 12

## STATUTES

Antitrust Modernization Commission Act of 2002,
  Pub. L. No. 107-273, § 11054(h), 116 Stat. 1856, 1857 (2002) .................................................. 9

Ariz. Rev. Stat. Ann. § 44-1412 .................................................................................................... 6

Cal. Bus. & Prof. Code § 17200 .................................................................................................. 10

Clayton Act,
  15 U.S.C. § 26 ............................................................................................................................ 5

D.C. Code Ann. § 28-4515 ............................................................................................................ 6

Fla. Stat. ch. § 501.205 .................................................................................................................. 6

Fla. Stat. ch. § 542.32 .................................................................................................................... 6

Iowa Code § 553.2 .......................................................................................................................... 6

La. Rev. Stat. Ann. § 51:122-123) ............................................................................................... 29

MASS. GEN. LAWS ANN.
  Ch. 93, § 3 (West 1994) ........................................................................................................... 29

Mass. Gen. Laws ch. 93 § 1 ........................................................................................................... 6

Mich. Comp. Laws Ann. § 445.784(2) .......................................................................................... 6

N.D. Cent. Code, § 51.08.1-01 ...................................................................................................... 6

N.J. Stat. Ann. § 56:9-18 ............................................................................................................... 6

N.M. Stat. Ann. § 57-1-15 ............................................................................................................. 6

Nev. Rev. Stat. Ann. § 598A.050 ................................................................................................... 6

S.D. Codified Laws § 37-1-22 ....................................................................................................... 6

W.Va. Code § 47-18-16 .................................................................................................................. 6

## OTHER AUTHORITIES

P. Areeda & H. Hovenkamp,
  Antitrust Law ¶ 1769c, at 413 ................................................................................... 7, 8, 10, 23

Report and Recommendations of the Antitrust Modernization Commission ................................. 9

## RULES

Fed. R. Civ. P. 12(b)(1) ................................................................................................................. 5

Fed. R. Civ. P. 12(b)(6) ............................................................................................................5

**PRELIMINARY STATEMENT**

In October 2005, Ortho Biotech Products, L.P. ("Ortho") filed an action in this Court alleging that the bundled discount pricing strategy employed by Amgen Inc. and Amgen USA Inc. (collectively, "Amgen") violates the antitrust laws and injures Ortho by decreasing Ortho's market share. Ortho Biotech Products, L.P. v. Amgen, Inc., et al., Civ. Act. No. 05-4859. Over two years later, Plaintiff Sheet Metal Workers National Health Fund ("SMW Health Fund") filed the present action, purporting to claim injury from the very same pricing strategy. SMW Health Fund is neither a competitor in the marketplace, nor a direct purchaser of the products in question, nor even a purchaser from a direct purchaser. Rather, Amgen sells to distributors, who resell to oncology clinics (and others), who resell to patients, some of whom are allegedly reimbursed, in part, by Plaintiff.

Despite the passage of time and the resulting opportunity carefully to investigate how the discounts have actually affected the reimbursements it makes to patients, SMW Health Fund's Complaint is little more than a photocopy of Ortho's 2005 complaint, bereft of sufficient facts to show that Plaintiff has suffered or is threatened with any injury-in-fact. Indeed, despite filing a Complaint based entirely on the allegedly anticompetitive effects of a bundled pricing strategy, Plaintiff completely fails to allege that the price to oncology clinics of ***the bundle*** of products in the aggregate is higher than it would be absent Amgen's bundled contract, or that Plaintiff has paid more for the combination of products in the aggregate than it would have absent the bundled discount. This omission is fatal. Both the absence of injury-in-fact and the convoluted nexus between the conduct in question and the Plaintiff each independently deprive SMW Health Fund of standing to prosecute this action. Moreover, even if Plaintiff had standing, it has failed to plead the essential elements of the antitrust claims it alleges, as further detailed below. Finally, many of the state law claims asserted by Plaintiff suffer from other infirmities that are set forth in this Memorandum. For all of these reasons, the Complaint should be dismissed.

**STATEMENT OF FACTS**[1]

Red Blood Cell Growth Factor ("RBCGF") drugs are most commonly used to treat anemia in patients undergoing chemotherapy, patients with chronic kidney disease and patients undergoing a particular treatment for HIV infection. Compl. ¶¶ 15-17. White Blood Cell Growth Factor ("WBCGF") drugs are used to treat neutropenia, a white blood cell deficiency that can result from chemotherapy. Compl. ¶ 23. The sale of RBCGF drugs is a two-player market. Amgen sells a RBCGF drug under the brand name Aranesp®, and Ortho sells its competing drug under the brand name Procrit®. Compl. ¶ 2. Amgen also sells WBCGF drugs that face little competition, and Amgen has a 98% share of WBCGF sales to oncology clinics. Compl. ¶¶ 24-26.

RBCGF and WBCGF drugs are sold for administration to chemotherapy patients through various channels, including oncology clinics, hospitals and retail drug stores. Compl. ¶¶ 38, 69, 73. Many patients receive both RBCGF drugs and WBCGF drugs, and virtually all oncology clinics purchase both. Compl. ¶¶ 23, 28. Plaintiff does not allege that there is any difference in the RBCGF products sold in the oncology clinics and the RBCGF products sold in the other channels. Plaintiff nevertheless concludes that the sale of RBCGF to oncology clinics is a separate "relevant product market." Compl., Subheading IV, J; Compl. ¶¶ 69-78.

The market for RBCGF drugs is substantial, with sales in 2005 exceeding $3.8 billion through oncology clinics alone. Compl. ¶ 69. From 1991, when Ortho obtained Food and Drug Administration ("FDA") approval to market Procrit®, until 2002, when Amgen received approval to sell Aranesp® for the treatment of chemotherapy-induced anemia, Procrit® had a complete monopoly on the sale of RBCGF drugs for such treatment. Compl. ¶¶ 17-22. In 2002, Amgen

---

[1] The facts are taken from Plaintiff's Complaint and are treated as true for the limited purposes of this motion, even though Amgen would dispute the accuracy of many of them. The Court need not, however, accept either the Complaint's conclusory allegations or any implausible inferences. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997); Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1966 (2007).

received approval for Aranesp®, thus ending Ortho's "market exclusivity" (Compl. ¶ 20) and introducing competition where there previously had been none.  Ortho continues to enjoy a 70% share of sales of RBCGF through the retail drug store channel.  Compl. ¶ 38.

As of April 2004, Ortho continued to have more than a 50% share of RBCGF sales to oncology clinics.  Compl. ¶ 4.[2]  In the spring of 2004, Amgen began offering "substantial rebates" to oncology clinics that reached combined volume requirements for purchases of Aranesp® and Amgen's WBCGF drugs (hereinafter referred to as "bundled discounts").  Compl. ¶ 29.  Plaintiff alleges that Amgen's bundled discounts were tied to a percentage of the market share of each clinic's historical usage and were designed to win market share from Amgen's rival, and long-time monopolist, Ortho.  Compl. ¶¶ 29-36.  The Complaint states that the bundled discounts caused clinics to buy less Procrit® and more Aranesp®, Compl. ¶¶ 35, 44, 52, because the more WBCGF and Aranesp® the clinics buy, the greater the rebates they receive.  Compl. ¶¶ 40-43.  As an alleged result of Amgen's rebate program, the respective shares of sales of RBCGF to oncology clinics in this two-player market shifted from approximately 55-45 in favor of Ortho in the spring of 2004 to 34-66 in favor of Amgen as of October 2005.  Compl. ¶¶ 4.

Plaintiff does not allege that Amgen will sell its WBCGF only on the condition that clinics also buy Aranesp®.  See Ortho Biotech Prods. v. Amgen Inc., Civ. Act. No. 05-4859, slip op. at 7 (D.N.J. Nov. 21, 2006) ("No clinic was required to purchase Aranesp® in order to purchase Amgen's WBCGF products.").  Plaintiff does allege that clinics that purchase significant amounts of Aranesp® receive "massive rebates" on Amgen's WBCGF drugs.  Compl. ¶ 64.  From this and other facts, Plaintiff concludes that clinics are "forced" to buy "all or substantially all" their RBCGF drugs from Amgen.  Compl. ¶¶ 7, 64.  In contrast to these conclusory allegations, however, the Complaint specifically alleges that as of October 2005 (the

---

[2] While Paragraph 4 of the Complaint does not explicitly allege Ortho's April 2004 share, it alleges that Amgen's 66% October 2005 share was a 46% increase over Amgen's April 2004 share.  If one does the math, that means that Plaintiff alleges an Amgen share in April 2004 of 45%, leaving 55% for Ortho.

- 3 -

last date for which the Complaint specifies market shares) approximately 34% of all clinic purchases of RBCGF were of Ortho's competing Procrit® product, and that clinics can qualify for the vast majority of Amgen's bundled discounts despite buying more than a third of their RBCGF drugs from Ortho.  Compl. ¶¶ 36, 40-41.  The Complaint contains no attempt to reconcile its contradictory allegations that Ortho makes one out of every three sales in a market composed of clinics that are supposedly "forced" to buy "all" their RBCGF from Amgen.

According to the Complaint, Amgen's pricing program offered WBCGF and RBCGF for sale to oncology clinics subject to rebates at seven different levels depending upon the amount of WBCGF and RBCGF purchased.  Compl. ¶ 40.  Plaintiff does not allege that Amgen has priced Aranesp® below cost, by whatever measure.  Plaintiff also does not allege that Amgen is likely to recoup these rebates through future price increases, if, hypothetically, Ortho were to exit the market.  The Complaint also contains no explicit allegation that Amgen has monopoly power in the "market" for RBCGF sales to oncology clinics.  The Complaint posits alleged "barriers to entry" into the market by new rivals, Compl. ¶ 79, but contains no allegation that Ortho, which until six years ago sold 100% of the RBCGF sold to oncology clinics and continues to dominate the retail channel, lacks the capacity to expand its output.

Most of the narrative in Plaintiff's Complaint concerns how Ortho has been allegedly disadvantaged by Amgen's discounting strategy, Compl. ¶¶ 20-21, 28, 35-37, 56-57, rather than the alleged harm to SMW Health Fund, which is an end-payer that reimburses part of certain retired sheet metal workers' medical expenses.  Compl. ¶ 13.[3]  Plaintiff alleges only in conclusory fashion that the effect of the bundled discounts was to raise the price paid by clinics for RBCGF, to the detriment of end-payers, such as Plaintiff.  E.g., Compl. ¶¶ 7, 54, 55.  These conclusory allegations are at odds, however, with the remaining, specific factual allegations of the Complaint that (a) the bundled discounts have caused clinics to buy more and more Aranesp®

_____

[3] While the Complaint states that Plaintiff reimburses members "across the country," id., the Plaintiff does not specifically allege that it has reimbursed a patient in each of the 28 states whose laws the Complaint invokes.

- 4 -

and (b) the more Aranesp® they buy, the bigger the discounts they receive.  Compl. ¶¶ 35, 40-44,

52.  In addition, the Complaint specifically alleges both that "offering [WBCGF] rebates tied to

Aranesp® purchases *allows Amgen to make it financially attractive to buy Aranesp*," and that

"WBCGF rebates are a *disguised way of discounting Aranesp*."  Compl. ¶¶ 55-56 (emphasis

added).  Yet, despite the fact that the Complaint acknowledges that many patients and virtually

all clinics buy both products, the Complaint contains no allegation that the aggregate *combined*

*costs* of RBCGF and WBCGF to the clinics, to the putative class in general, or to this Plaintiff in

particular are higher net of all applicable discounts, including those on WBCGF, than they would

be in the absence of the bundled discounts.

**LEGAL ARGUMENT**

**POINT I**

**SMW HEALTH FUND LACKS STANDING.**

**A.      Plaintiff's Antitrust Claims For Damages Should Be Dismissed**
**For Failure Sufficiently To Plead Injury-In-Fact.**

To establish standing, a plaintiff seeking to recover antitrust damages must, among other

things, allege that it has suffered an injury-in-fact by reason of the violation.[4]  See, e.g., City of

Pittsburgh v. West Penn Power Co., 147 F.3d 256, 268 (3d Cir. 1998) ("[P]laintiff must establish

that he actually sustained injury-in-fact to business or property . . . .");  Andrx Pharms., Inc. v.

Biovail Corp. Int'l, 256 F.3d 799, 806 (D.C. Cir. 2001) ("The plaintiff's first step is to plead an

injury-in-fact . . . .").[5]  In assessing the adequacy of a complaint, the Court is not required to

---

[4] Injury-in-fact is also a requirement of Article III standing under the U.S. Constitution, and its
absence deprives this Court of subject matter jurisdiction.  See Maio v. Aetna, Inc., 221 F.3d
472, 481 n.7 (3d Cir. 2000).  For this reason, this motion seeks dismissal both under Fed. R. Civ.
P. 12(b)(1) and 12(b)(6).

[5] Plaintiff seeks relief under both federal and state antitrust laws.  Although the "Prayer for
Relief" does not make clear which remedies are sought for which claims, the first count of the
Complaint, which is the only one alleging federal antitrust violations, seeks only injunctive relief
under § 16 of the Clayton Act, 15 U.S.C. § 26.  Therefore, Plaintiff's antitrust damages claims
appear to be asserted exclusively under various state antitrust statutes, in likely recognition of the
fact that Plaintiff lacks standing to seek damages under § 4 of the Clayton Act because it is not a

credit conclusory allegations or draw implausible inferences.  <u>Morse v. Lower Merion Sch. Dist.</u>,

132 F.3d 902, 906 (3d Cir. 1997) (stating that "a court need not credit a complaint's 'bald

assertions' or 'legal conclusions' when deciding a motion to dismiss"); <u>Bell Atlantic Corp. v.</u>

<u>Twombly</u>, 127 S. Ct. 1955, 1965 n.3 (2007) (Rule 8 "requires a 'showing,' rather than a blanket

assertion, of entitlement to relief."); <u>Id.</u> at 1966 ("Some threshold of plausibility must be

crossed").  "Factual allegations must be enough to raise a right to relief above the speculative

level . . . .  " <u>Id.</u> at 1964-65.  **"[S]omething beyond the mere possibility of loss causation must**

**be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of**

**a number of other people . . . ."** <u>Id.</u> at 1966 (emphasis added).  "A district court must retain the

power to insist upon some specificity in pleading before allowing a potentially massive factual

controversy to proceed."  <u>Id.</u> at 1967.

     The Complaint does not cross the "threshold of plausibility" and alleges nothing more

than "the mere possibility of loss causation."  While the Complaint discusses at length how

---

direct purchaser.  <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977).  Nevertheless, this
Memorandum of Law cites to federal antitrust cases on the subject of injury because the various
states in question, either by explicit statutory direction or judicial decisions, follow federal
antitrust precedent in the interpretation of their state statutes.  Ariz. Rev. Stat. Ann. § 44-1412;
D.C. Code Ann. § 28-4515; Fla. Stat. ch. § 501.205; Fla. Stat. ch. § 542.32; Iowa Code § 553.2;
Mass. Gen. Laws ch. 93 § 1; Mich. Comp. Laws Ann. § 445.784(2); Nev. Rev. Stat. Ann. §
598A.050; N.J. Stat. Ann. § 56:9-18; N.M. Stat. Ann. § 57-1-15; S.D. Codified Laws § 37-1-22;
W.Va. Code § 47-18-16; N.D. Cent. Code, § 51.08.1-01; <u>see</u> <u>Burr v. Kulas</u>, 564 N.W.2d 631,
636 (N.D. 1997); <u>Orr v. BHR, Inc.</u> No. 00-3135, 2001 U.S. App. LEXIS 2391, at *7-8 (10th Cir.
Feb. 16, 2001) (applying Kansas law); <u>Louisiana ex rel. Ieyoub v. Bordens, Inc.</u>, 684 So.2d 1024,
1027 (La. App. 4 Cir. 1996); <u>Davric Maine Corp. v. Rancourt</u>, 216 F.3d 143, 148 (1st Cir. 2000)
(applying Maine law); <u>Lamminen v. City of Cloquet</u>, 987 F. Supp. 723, 734 (D. Minn. 1997)
(applying Minnesota law); <u>Smith v. Milk Prods., LLC</u>, No. 4:99-CV-21-B-A, 1999 U.S. Dist.
LEXIS 9492, at *2-3 (N.D. Miss. June 1, 1999) (applying Mississippi law); <u>Max 100 L.C. v.</u>
<u>Iowa Realty Co. Inc.</u>, 621 N.W.2d 178, 181-82 (Iowa 2001); <u>Anheuser-Busch, Inc. v. Abrams</u>,
520 N.E.2d 535, 539 (N.Y. 1988); <u>N.C. Steel, Inc. v. Nat'l. Council on Compensation Ins.</u>, 472
S.E.2d 578, 582 (N.C. Ct. App. 1996); <u>Rockholt Furniture, Inc. v. Kincaid Furniture Co., Inc.</u>,
No. 1:96-CV-588, 1998 WL 1661384, at *7 (E.D. Tenn. July 6, 1998) (applying Tennessee law);
<u>Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.</u>, 529 N.W.2d 905, 911 (Wis. 1995).
Federal precedent is also applicable because, as stated above, injury-in-fact is a requirement of
Article III standing under the U.S. Constitution.

Amgen's discounts have eroded Ortho's market share,[6] it contains little to justify its "bald assertions" that the bundled discounting program has somehow raised the price paid by clinics for RBCGF, or, even if it has, how SMW Health Fund is injured by this in light of the corresponding "massive rebates" on WBCGF.  The Complaint is barren of any allegation that SMW Health Fund has paid more for the combination of products in the aggregate, net of all applicable discounts, than it would have absent of the bundle.  Without such an allegation, the Complaint cannot survive.

> **1.  SMW Health Fund Has Not Pled That Prices For The Combination Of Products Are Higher In The Aggregate Than They Would Be Absent the Bundle.**

Plaintiff fails to allege injury-in-fact because of its complete failure to assert that its aggregate costs for WBCGF and RBCGF combined are higher than they otherwise would be. Plaintiff can not be said to have alleged injury-in-fact merely by stating that RBCGF is costing it more, without addressing whether that "overcharge" is completely offset by the "massive rebates" on WBCGF.  On this point, the Complaint is utterly silent.  As explained by Areeda & Hovenkamp, "[I]n most cases a premium price on the tied product must be accompanied by a reduction in the price of the tying product."  P. Areeda & H. Hovenkamp, <u>Antitrust Law</u> ¶ 1769c, at 413.  The United States Court of Appeals for the Eleventh Circuit has held:

> A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, *since a lower price might conceivably have been exacted by the [seller] for the tying product*.  Unless the fair market value of both the tied and tying products are determined and an overcharge

---

[6] The Complaint is remarkably pre-occupied with Ortho's pocketbook.  Indeed, in paragraphs 17-21 of the Complaint, Plaintiff actually seems to be complaining about Amgen having rained on Ortho's monopoly parade, with allegations couched in language that almost implies that it was somehow unfair for Amgen to enter Ortho's "exclusive" market ("circumventing the exclusive rights granted to Ortho").  Surely, Plaintiff would acknowledge that Aranesp®'s 2002 entry into the market, creating competition where there had been none, benefited buyers of RBCGF.  See <u>Ortho Biotech Prods. v. Amgen Inc.</u>, Civ. Act. No. 05-4859, slip op. at 6 (D.N.J. Nov. 21, 2006) ("When Aranesp was launched, price competition between the two products was fierce.").

- 7 -

in the ***complete price*** found, no injury can be claimed; suit, then, would be foreclosed.

Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.), cert. denied, 459 U.S. 857 (1982) (emphases added); see also Will v. Comprehensive Accounting, 776 F.2d 665, 672-73 (7th Cir. 1985), cert. denied, 475 U.S. 1129 (1986) ("Unless the plaintiff shows that the package price was elevated the suit must be dismissed without further ado.") (adopting Kypta); L. Knife & Son v. Banfi Prod. Corp., 118 F.R.D. 269, 271 (D. Mass. 1987) (adopting Kypta); Freeland v. A.T. & T. Corp., 238 F.R.D. 130, 149-50 (S.D.N.Y. 2006) (adopting Kypta).  As Areeda & Hovenkamp further explain:

> Even when the products are not used exactly in fixed proportions, tied-product premiums are often offset by tying-product discounts below the price that would have prevailed without tying. . . . [D]amages arise when the combination price exceeds the sum of individual prices that would prevail absent the tie.

Antitrust Law ¶ 1769c, at 415.[7]

The wisdom of the Kypta line of cases is confirmed by the plain language of Plaintiff's Complaint.  Plaintiff specifically pleads that "offering [WBCGF] rebates tied to Aranesp® purchases ***allows Amgen to make it financially attractive to buy Aranesp***," and that "WBCGF rebates are a ***disguised way of discounting Aranesp***."  Compl. ¶¶ 55-56 (emphasis added).  Having explicitly pled the interrelationship between the "massive rebates" on WBCGF and the true net cost to Aranesp® buyers, Plaintiff cannot now escape the need to plead that it has suffered an ***aggregate*** overcharge, net of all discounts on all bundled products, in order to establish injury-in-fact.  The Complaint cannot survive dismissal based only on "the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 127 S. Ct. at 1968.

The need to demand that Plaintiff plead facts showing a net injury is all the more acute because of the nature of the particular "violation" that Plaintiff alleges.  It is universally

---

[7] With respect to courts that have arguably permitted claims of injury based solely on higher prices for the allegedly tied product, Areeda & Hovenkamp comment simply that they are "quite wrong."  Antitrust Law ¶ 1769c, at 413.

recognized that bundled discounts can have many procompetitive uses that lower prices to consumers. The Congressionally commissioned Report and Recommendations of the Antitrust Modernization Commission recently recognized some of these [8] ("AMC Report"):

> Instead of advertising, firms can use bundled discounts to increase demand . . . . A firm selling a product in one market may employ a bundling strategy as a means of encouraging consumers in another market to try a new product. In some cases, bundling can help a firm enter a new market and compete with established firms.[9]
>
> *       *       *
>
> These types of bundling can result in bundled discounts or rebates that significantly lower prices to consumers. One witness noted that "virtually everyone who submitted a paper tends to agree that bundling is pro-consumer. It is a way of discounting; it's a way of waging competition."

AMC Report, at 95.

Amgen does not point out these recognized benefits of bundled discounts for the purpose of asking the Court on this motion to decide whether Amgen's rebates are a "good bundle" or a "bad bundle." Rather, the point here is that bundled discounts in general have a high enough,

---

[8] The Commission was created by Act of Congress. Antitrust Modernization Commission Act of 2002, Pub. L. No. 107-273, § 11054(h), 116 Stat. 1856, 1857 (2002).

[9] The Court will readily see the similarity between the types of procompetitive uses identified above in the AMC Report--i.e., a new entrant bundles to attract customers away from an established firm--and the fact pattern disclosed by the Complaint. In this respect, the facts set forth in the Complaint bear no resemblance to the situation addressed by the Third Circuit in LePage's v. 3M, 324 F.3d 141 (3d Cir. 2003). LePage's concerned behavior by a long-term, entrenched monopolist in the market for transparent tape to protect its branded-product monopoly against incursion from a rival selling private-label tape. LePage's, 324 F.3d at 164 ("There is considerable evidence that 3M entered the private-label market only to 'kill it'.") By contrast, the Complaint alleges that until 2001 Ortho was a monopolist in the RBCGF oncology clinic "market," and continued to have the lion's share of the market at the time Amgen introduced the bundled rebates. Thus, unlike in LePage's, the bundled discounts here were used by the new entrant to compete with the established firm. The AMC Report recognizes this precise use of bundled discounts as procompetitive behavior. Under the distinct facts of this case, Amgen submits that a monopolization claim based on bundled discounts that fails to allege both pricing below some appropriate measure of cost and the likelihood of future recoupment is deficient as a matter of law, and that a proper reading of LePage's does not dictate otherwise. As Plaintiff lacks standing to proceed, this merits issue need not be reached at this time.

- 9 -

well-recognized propensity to be procompetitive and consumer welfare-enhancing that cases challenging them evoke the Supreme Court's often expressed concern that care must be taken not to allow antitrust litigation to chill the very behavior the antitrust laws are designed to foster. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986) (Because "cutting prices in order to increase business often is the very essence of competition . . . mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect."); Verizon Communications Inc. v. Trinko, 540 U.S. 398, 414 (2004); Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 127 S. Ct. 1069, 1074-75 (2007). Professor Hovenkamp has recognized that these very concerns are triggered when bundled discounts are challenged.  P. Areeda & H. Hovenkamp, Antitrust Law ¶ 749, at 323 (Supp. 2006) ("[T]he same concerns about . . .the danger of overdeterrence, or false positives, apply.").  This prudent concern, when coupled with the Supreme Court's admonition in Twombly that the high cost of antitrust litigation warrants scrutiny of a plaintiff's claim at the pleading stage, 127 S. Ct. at 1966-67, makes it all the more important that this Court not allow Plaintiff's claim to proceed with no allegation of elevated, combined product costs, in the face of specific facts suggesting the opposite inference.  Accordingly, having restricted even its conclusory allegations about price elevation to RBCGF alone, and having nowhere pled that the cost of the package of products in the bundle is higher than it would be absent the bundle, Plaintiff has failed adequately to plead that it has suffered injury-in-fact.  Therefore, it has established neither Article III standing nor antitrust standing, and its Complaint must be dismissed.[10]

---

[10] The only one of Plaintiff's claims not asserted under federal or state antitrust law is its claim under Cal. Bus. & Prof. Code § 17200, et seq.  The arguments set forth above equally deprive Plaintiff of standing to assert claims under that statute.  In order to obtain "any relief" under the California statute, a plaintiff must plead that it has "suffered injury in fact" and "lost money or property."  Id. § 17204.  Accordingly, Plaintiff's claim fails.  See TruePosition Inc. v. Andrew Corp., 507 F. Supp.2d 447, 466 (D. Del. 2007) (recognizing that a plaintiff pursuing a claim under Cal. Bus. & Prof. Code § 17200 must plead both that it suffered an injury-in-fact and that it lost money or property as a result of unfair competition).

2.   **Plaintiff Has Not Pled Facts Supporting Its Conclusory Allegation That RBCGF Prices Are Higher As A Result Of The Bundle.**

Even if this Court were to decline to follow the <u>Kypta</u> line of cases and hold that Plaintiff need not plead an increase in aggregate reimbursement costs for RBCGF and WBCGF, Plaintiff has also not adequately alleged that it has reimbursed more dollars for RBCGF alone than it would have absent the bundled discounts.  Reduced to its essentials, the Complaint alleges this: Through "massive rebates" on WBCGF, as a "disguised way of discounting Aranesp," Amgen was able to "make it financially attractive to buy Aranesp" in a manner that Ortho cannot match, leading to a 19-point erosion of Ortho's market share from 55% to 36%.  These allegations cannot support the ultimate conclusion that Plaintiff seeks to draw from them -- that consumers pay higher RBCGF prices by reason of the bundled discounts.  To be sure, a "bald assertion" of higher prices is all that Plaintiff provides; the Complaint stands mute on what prices were before bundling began in 2004, what they were in 2005, what they are now, or what they would have been absent the bundle.[11]  Even if it were true -- which it is not -- that Amgen has discovered a way of delivering economic benefit to its buyers that Ortho cannot match,[12] that may well cost Ortho market share, but it does not plausibly support a wholly conclusory allegation that Amgen's bundle has inflated the price of RBCGF.  On this motion, it is not necessary for the Court to speculate about whether there exists "no set of facts"[13] by which the bundled discounts could have caused a net increase in the prices paid for RBCGF in an alleged market where a significant, sophisticated rival is still making one-third of all sales.  Rather, it is enough for the

---

[11] The single exception is the allegation of the Neulasta® (WBCGF) price in paragraph 50 of the Complaint.  Of course, the Complaint makes no claim of higher WBCGF prices; rather, it asserts that they were "massive[ly] rebate[d]."

[12] Amgen contends that Ortho can, and in many instances has, competed with the bundle to the further benefit of consumers, but the Court need not confront that issue to decide this motion.

[13] Reference here is to the former mantra that a complaint should not be dismissed unless "plaintiff can prove no set of facts in support of his claim."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  In <u>Twombly</u>, the Supreme Court overruled that aspect of <u>Conley</u>, holding that this overly permissive standard had "earned its retirement."  <u>Twombly</u>, 127 S. Ct. at 1968-69.

Court to recognize that the "bald assertion" of higher RBCGF prices is sufficiently at odds with the other facts pled in the Complaint so as to trigger a concern that "something beyond the mere possibility of loss causation must be alleged" and that the Court should exercise "the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  See Twombly, 127 S. Ct. at 1966-67.  Without more, this Court should not credit Plaintiff's conclusions by inferring an aggregate RBCGF cost increase from a set of facts that are at least as consistent, and likely more consistent, with a cost decrease.  See, e.g., Twombly, 127 S. Ct. at 1964 (holding, in the conspiracy context, that where two equally plausible inferences can be drawn from the facts pled, one consistent with plaintiff's conclusion of an antitrust claim and the other not, the complaint is inadequate absent additional facts "tending to exclude the possibility of" the innocent inference) (citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U. S. 752 (1984) and Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U. S. 574 (1986)).

> **B.      Plaintiff's Claim For Injunctive Relief Under § 16 Of The Clayton Act Should Be Dismissed For Failure Sufficiently To Plead A Substantial Threat Of Injury-In-Fact.**

Plaintiff's failure to establish its standing to pursue a claim for damages is not saved by its claim for injunctive relief.  To establish standing to seek injunctive relief, a claimant must show "a significant threat of injury" from the antitrust violation.  Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 126 (1986) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130 (1969)).  The Complaint fails to do so.  Having made only "bald assertions" concerning an impact on RBCGF prices, and no allegations whatsoever of an aggregate impact on the combination of prices, the Complaint provides no basis for inferring that Plaintiff is under any, much less a "significant" threat, of injury in the future.  Just as the Complaint fails to allege that Plaintiff has reimbursed more for the combination of products than it would have absent the bundle, Plaintiff equally fails to allege that such a scenario is substantially likely (or even at all likely) to happen in the future.  Moreover, the Complaint

contains no allegation that there is any prospect that Amgen would have any ability to recoup the money it has doled out in "massive rebates" through some future price increase to which Ortho would not respond.[14]  In short, the Complaint is completely barren of facts necessary to establish a significant threat of future injury, and the claim for injunctive relief must be dismissed.

> **C.      Even if SMW Health Fund Had Alleged Injury-In-Fact, Its Injury Is Too Indirect And Too Remote To Confer Antitrust Standing.**

As set forth above, the entirety of Plaintiff's Complaint should be dismissed for failure adequately to plead injury-in-fact, and thus the remaining bases for dismissal need not be decided.  Even if Plaintiff could overcome this flaw, however, it would still lack standing because its alleged injury is indirect and remote.  As explained in footnote 4, supra, Plaintiff does not seek damages under federal antitrust law because such a claim would be plainly barred by Illinois Brick, as Plaintiff is not a direct purchaser of Aranesp®.  Plaintiff seeks instead to recover damages under the antitrust statutes of various states.  While some states have enacted "Illinois Brick repealer" legislation, allowing damages claims by some indirect purchasers, several of the states whose laws the Complaint invokes have not.  Therefore, Plaintiff's claims for antitrust damages under those states' antitrust statutes should be dismissed, even if the Court were to find that Plaintiff has pled injury-in-fact.  In addition, under the particular facts of this case, even in those states that have enacted Illinois Brick repealer legislation, SMW Health Fund is too remote from the conduct in question to satisfy antitrust standing requirements.  Finally, the Complaint is insufficient to establish standing because SMW Health Fund does not allege that it has paid an overcharge in each of the states whose laws it invokes.

---

[14] This marks another point of dramatic departure between this Complaint and the facts confronted by the court in LePage's.  In LePage's, the Third Circuit placed considerable emphasis on the fact that "**[d]efendant concede[d] that 3M could later recoup the profits it has forsaken** on Scotch tape and private label tape by selling more higher priced Scotch tape . . . .  There was evidence from which the jury could have determined that 3M intended to force LePage's from the market, and then cease or severely curtail its own private-label and second-tier tape lines."  324 F.3d at 162-63 (emphasis added).  Plaintiff here makes no corresponding allegation concerning recoupment.

- 13 -

    **1.**    **SMW Health Fund's Damages Claims under Florida, Louisiana, Massachusetts and New Jersey Law Should Be Dismissed Because These State Antitrust Laws Do Not Recognize Indirect Purchaser Standing.**

A number of the states enumerated in the Complaint follow <u>Illinois Brick,</u> and their state antitrust statutes do not recognize indirect purchaser standing.  Accordingly, Plaintiff's claims under the following state antitrust laws should be dismissed:  Florida, Louisiana, Massachusetts, and New Jersey.  <u>See</u> <u>Mack v. Bristol-Myers Squibb Co.,</u> 673 So.2d 100, 103 (Fla. Dist. Ct. App. 1996); <u>Free v. Abbott Labs.,</u> 176 F.3d 298, 299 (5th Cir. 1999), <u>aff'd,</u> 529 U.S. 333 (2000); <u>Ciardi v. Hoffmann-LaRoche, Ltd.,</u> 762 N.E.2d 303 (Mass. 2002); <u>Sickles v. Cabot Corp.,</u> 379 N.J. Super. 100 (App. Div.), <u>certif. denied,</u> 185 N.J. 297 (2005).

    **2.**    **Plaintiff Is Too Far Removed From The Challenged Conduct To Have Antitrust Standing to Assert Damage Claims Under the Remaining State Antitrust Laws Invoked in the Complaint.**

While <u>Illinois Brick</u> repealer statutes remove the absolute bar to standing on behalf of indirect purchasers, <u>Illinois Brick</u> is not the only barrier to standing for those whose nexus to the challenged sale is remote or tenuous.  Rather, antitrust standing is also limited by the factors set forth by the Supreme Court in <u>Associated General Contractors of Calif., Inc. v. California State Council of Carpenters,</u> 459 U.S. 519 (1983) ("<u>AGC</u>").[15]  The Supreme Court has held that the analysis under <u>AGC</u> and the holding of <u>Illinois Brick</u> are analytically distinct.  <u>International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.,</u> 196 F.3d 818, 828 (7th Cir. 1999).  Accordingly, the application of <u>AGC</u> does not undermine the state policies reflected by their rejection of <u>Illinois Brick</u>'s *per se* bar of indirect purchaser standing.  Thus, while certain states have determined that indirect purchasers may have suffered injuries compensable under state antitrust law, state law does not grant standing to *every* indirect purchaser or end-payer, no matter how remote its injury may be.

---

[15] See footnote 5, <u>supra</u>, regarding the fact that the various states follow federal precedent in the application of their antitrust acts.

Under AGC, the question of antitrust standing "requires [the court] to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." AGC, 459 U.S. at 535.  Where the relationship is overly complex, remote or tenuous, standing is denied.  See, e.g., Teague v. Bayer AG, No. 05 CVS 90, 2007 WL 2569668, at 7-10 (N.C. Super. May 7, 2007), ; Lorix v. Crompton Corp., 736 N.W.2d 619, 631 (Minn. 2007); In re Dynamic Random Access Memory Antitrust Litig. ("In Re DRAM Antitrust Litig."), 516 F. Supp. 2d 1072, 1090-91 (N.D. Cal. 2007).  Many courts in Illinois Brick repealer states have applied the AGC analysis to determine the limits of standing to assert claims under state antitrust laws.  See, e.g., In re DRAM Antitrust Litig., 516 F. Supp. 2d at 1090-91; In re New Motor Vehicles Canadian Exp. Antitrust Litig., 235 F.R.D. 127 (D. Me. 2006); Southard v. Visa USA, 734 N.W.2d 192, 198 (Iowa 2007); Kanne v. Visa USA, 723 N.W.2d 293 (Neb. 2006); Ho v. VISA USA, Inc., 2004 NY Slip Op. 50415U at *2, 3 Misc.3d 1105A (Sup. Ct., N.Y. County Apr. 21, 2004); Beckler v. VISA USA, Inc., No. Civ. 09-04-C-00030, 2004 WL 2475100 (Sept. 21, 2004); Peterson v. VISA USA, Inc., No. Civ. A. 03-8080, 2005 WL 1403761 (D.C. Super. Apr. 22, 2005); see also Teague, 2007 WL 2569668 (applying AGC factors modified to be consistent with North Carolina law); Fucile v. VISA USA, Inc., No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. 2004)  (applying AGC factors to the extent they are consistent with general recognition of indirect purchaser standing).[16]  Under the circumstances of this case, this Court should conclude that SMW Health Fund lacks standing even under the laws of states where Illinois Brick does not apply.

To understand why the mere "repeal" of the Illinois Brick rule does not confer state antitrust standing on SMW Health Fund, one must first examine the difference between the

---

[16] Even under state statutes where state courts have not applied the AGC factors in indirect purchaser cases, the universe of potential indirect purchaser plaintiffs is limited by remoteness, proximate cause, foreseeability and relation of the alleged injury to the purposes of the antitrust law.  See, e.g., Lorix, 736 N.W.2d at 631.  These are the same considerations that underlie the arguments set forth by Amgen here.  As a result, even in states that have limited the application of AGC, these prudential limitations deny Plaintiff standing to allege the claims set forth in the Complaint.

- 15 -

archetypical indirect purchaser scenario and the much different scenario reflected in the Complaint.  In the simple indirect purchaser case, a manufacturer sells a single product to a middleman, who resells it at some profit, as is, to a customer.  While such a customer lacks standing to bring a federal antitrust damages action, the customer can proceed under the law of a state with an <u>Illinois Brick</u> repealer.  The case before this Court, however, is not nearly so simple.  Here, the following chain of events take place:

(1)  Clinics buy WBCGF and Aranesp® and/or Procrit® from specialty distributors, who buy from Amgen and Ortho.  Compl. ¶ 76.  The prices of the WBCGF and Aranesp® are bundled and are at *one of seven different possible levels* depending upon the particular purchasing pattern of the particular clinic, Compl. ¶ 40;

(2)  The clinics sell the two individual component products included in the bundle (and Ortho's Procrit®) to patients in at least the following permutations: (a) some patients get WBCGF and Aranesp®, (b) some patients get only WBCGF, (c) some patients get only Aranesp®, (d) some patients get WBCGF and Procrit®, and (e) some patients get only Procrit®;

(3)  The manner in which a patient pays the clinic for that patient's particular mix of purchases, and the amount a patient pays, will vary in as many ways as there are types of health care coverage (e.g., self-insureds, traditional indemnity coverage, HMOs, PPOs, state and federal employee plans, Medicare, Medicaid, etc.), with any combination of regulated, unregulated, or negotiated prices, deductibles and/or co-payments;

(4)  Some portion of the cost for some patients will be either (a) paid directly or (b) reimbursed by end-payers, one of whom is SMW Health Fund; and, finally,

(5)  In some instances, the cost that a reimburser pays is largely divorced from the price actually paid by the clinic for the drugs administered to that patient.  In the case of Medicare or Medicare co-payment reimbursement, for example, the cost to the reimburser is instead a function of the various drugs' average selling price ("ASP"), which is impacted not only by sales occurring outside the challenged bundle, but also by sales occurring entirely outside the relevant

market as Plaintiff defines it.[17]  Thus, the actual net price charged by Amgen or Ortho to any particular clinic may bear little relationship to what ultimately represents the amount paid by the reimbursers of that clinic's patients.  See Compl. ¶¶ 48-49.

As is obvious, the Byzantine nature of the relationship between the actual bundled sales being challenged and the costs to any particular reimburser like this Plaintiff is far different from the simple case of a single product sale through a middleman at a mark-up.  Quite apart from the Illinois Brick bar, this set of facts cannot satisfy the AGC concerns about remoteness and complexity.  In this regard, Plaintiff's claim is similar to those wherein purchasers of consumer products have attempted to assert antitrust claims based upon the alleged price fixing of one of the product's components.  For example, in In re DRAM Antitrust Litig., purchasers of computers sought to assert antitrust claims against the manufacturers of Dynamic Random Access Memory (DRAM), which is a semi-conductor that is a component of computers, based upon an alleged price-fixing conspiracy among manufacturers of DRAM.  Because the plaintiffs purchased completed products containing DRAM, they were only indirect purchasers of DRAM.  Notwithstanding the fact that the various state antitrust statutes at issue contained Illinois Brick repealers, the court held that any alleged injury of the plaintiffs was too remote to confer standing to assert antitrust claims under state law:

> [E]ach product in which DRAM is a component contains numerous other components, all of which *collectively* determine the final price actually paid by plaintiffs for the final product.  In other words, the price for the actual product paid by plaintiffs is reflective of much more than just the component price for DRAM.  Yet plaintiffs' complaint sets forth no allegations that demonstrate that . . . the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable.  Seen from this

---

[17] Although the Complaint does not specify the nature of the coverage Plaintiff provides to its members, it appears from a complaint filed by SMW Health Fund against Amgen in California that SMW Health Fund's supplemental coverage pays the deductible and co-pays for medical services and prescription drugs covered by Medicare.  See Sheet Metal Workers National Health Fund v. Amgen Inc., CV07-05620 (PSG), Compl., ¶¶ 17-19.  The Court can take judicial notice of admissions made by a party in another pleading.  See, e.g., Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of allegations in complaint filed in state court).

viewpoint, the directness of plaintiffs' injury . . . is too remote to
warrant tipping this factor in favor of standing.

In re DRAM Antitrust Litig., 516 F. Supp. 2d at 1091.  The Complaint before this Court presents
an analogous, inverse situation.  Here, Amgen sells and prices a bundle of products and the
Complaint acknowledges that the discounts on some parts of the bundle (WBCGF) affect the true
cost of the other part (Aranesp®).  Compl. ¶¶ 55-56.  Yet, Plaintiff would seek to have this Court
trace the alleged "overcharge" after the clinic has, in effect, separated the bundled products and
sold each at a separately determined price that may bear little or no relationship to the true
bundled price paid by that clinic.  Just as the DRAM court found the relationship between the
price of the DRAM component to be too far removed from the ultimate price paid by the indirect
purchaser/consumer, there are far too many intervening factors here between the bundled, direct
sale and the final cost to a downstream reimburser.  In the case of Medicare co-payment
reimbursement, those intervening factors even include sales outside the challenged bundle and,
indeed, outside of the alleged relevant market entirely.

       To the extent Plaintiff claims that it has been injured because it has reimbursed for
RBCGF treatment for the allegedly higher priced Aranesp® as opposed to Procrit®, the additional
remoteness of Plaintiff's injury further precludes the claim.  Plaintiff suggests that Amgen's
bundled discount program has caused doctors to prescribe Aranesp® rather than Procrit®, which
Plaintiff alleges in a very conclusory fashion is less expensive.  Compl. ¶ 7.  There are a
multitude of factors that may contribute to why any given patient was prescribed Aranesp® as
opposed to Procrit®.  For example, SMW Health Fund's claimed injury does not account for the
medical judgment of each patient's physician as to the products' respective benefits either
generally or with regard to a particular patient's needs.  These potential intervening (and in the
case of health care, superceding) causes for an administration of Aranesp® render any alleged
injury to SMW Health Fund incredibly remote from Amgen's challenged contract.  Cf.  In re
DRAM Antitrust Litig., 516 F. Supp. 2d at 1092 (denying plaintiff standing to assert claim
because, among other things, the damage theory was far too speculative and complicated because

- 18 -

there are many factors that could have resulted in an increased price of each consumer product containing the component part subject to the alleged price fixing).

For all of these reasons, even under the laws of states that do not follow Illinois Brick, the connection between Plaintiff's costs and Amgen's bundled pricing behavior is far too remote, far too complex and far too speculative to support antitrust standing.

>    **3.   SMW Health Fund Lacks Standing to Assert State Antitrust Claims Because It Has Failed to Allege that It Has Made a Reimbursement in Each State.**

Plaintiff alleges only that it has "paid reimbursements for Aranesp administered in oncology clinics across the country," see Compl., ¶ 13, without any specific allegations as to the states in which those reimbursements were paid.  In order to demonstrate standing, the "named plaintiffs who represent a class must allege and show that they have been personally injured, not that injury has been suffered by other, unidentified members of the class . . . ."  Lewis v. Casey, 518 U.S. 343, 347 (1996).  At least one named plaintiff must have standing with respect to *each claim* that the class representatives seek to bring.  Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987), cert. denied., 486 U.S. 1005 (1986).  "Each claim" asserted by the named plaintiff "must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."  Id. at 1483.  Without specific allegations that Plaintiff has made a reimbursement in each of the states in which it seeks to allege an antitrust violation, Plaintiff lacks standing to assert claims under those states' statutes.  In re Terazosin Hydrochloride Antitrust Litig., 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) (holding that because: (1) no named plaintiff suffered an injury giving rise to an antitrust claim under the statutes in each of eleven states, (2) the named plaintiffs could not rely upon unidentified persons within those states to state a claim for relief and (3) because none of the statutes authorized antitrust actions based on commerce in other states, the claims under those states' statutes must be dismissed for lack of standing); In re Ditropan XL Antitrust Litig., 2007 WL 1411617 (N.D. Cal. May 11, 2007) (dismissing claims in twenty-four states for lack of

- 19 -

standing because none of the named plaintiffs either resided in or were alleged to have purchased the product at issue in any of those twenty-four states).

### POINT II

**THE COMPLAINT DOES NOT STATE A CLAIM FOR MONOPOLIZATION BECAUSE PLAINTIFF HAS NOT ALLEGED THAT AMGEN HAS MONOPOLY POWER IN THE ALLEGED RELEVANT MARKET.**

This Court can and should resolve this motion on standing grounds alone.  In an abundance of caution, however, Amgen also moves to dismiss because the Complaint is deficient in several other respects.  The remaining sections of this Memorandum of Law address those deficiencies, which are sufficient, independent grounds to dismiss the Complaint.  Plaintiff's allegations of an antitrust violation rest on the alternative grounds of (a) monopolization of the RBCGF oncology clinic "market" in violation of § 2 of the Sherman Act, and/or (b) "tying" in violation of § 1 of the Sherman Act (or the state antitrust equivalents of Sherman Sections 1 and 2).  For the reasons that follow, Plaintiff fails to state a claim for monopolization.

To discern the precise nature of the Sherman Act § 2 violation that Plaintiff seeks to assert, one must first try to decode Plaintiff's cryptic Complaint.  In Plaintiff's "First Claim For Relief," found at paragraphs 95-101, Plaintiff states that the conduct described in the Complaint "constitute[s] violations of Sections 1 and 2 of the Sherman Act."  Compl. ¶ 96.  The balance of the Claim for Relief, however, never mentions monopolization or any other Section 2 offense, using instead conclusory Section 1 language about the conduct of "Defendants and their co-conspirators."[18]  Therefore, if a Section 2 violation is to be found at all, it must be by reason of

---

[18] In fact, the First Claim For Relief, Compl. ¶¶ 95-100, contains the worst sort of conclusory, ambiguous pleading.  First, there is the puzzling reference to Defendants' "co-conspirators." Prior to this point in the Complaint, there was no reference to any co-conspirators, and the Complaint makes no effort to identify exactly who Paragraphs 97-99 are talking about when they speak of "co-conspirators."  Is Plaintiff alleging that Ortho is a co-conspirator?  The oncology clinics?  Also, completely out of left field and unrelated to anything said in the body of the Complaint, Paragraph 97 talks about Defendants and these alleged "co-conspirators" "fixing . . .the price of Aranesp."  It is as though Plaintiff lifted some boilerplate allegation out of a price-fixing complaint and, with little or no thought or care, slapped it in the middle of its Complaint in

- 20 -

paragraph 95's incorporation of the preceding body of the Complaint.  Turning to the body of the Complaint, there are a few conclusory references to an alleged monopolization of the "market" for the sale of RBCGF to oncology clinics.  The first reference occurs in the "Summary of Claims," where, in Paragraph 1, Plaintiff contends that the "purpose" of the bundled discounts was to "monopolize the market for sales of RBCGF drugs to oncology clinics."  Neither this paragraph nor the remainder of the Summary of Claims section, however, alleges that such a monopoly was actually achieved.  In fact, the Summary of Claims section makes no further reference to monopoly in the sale of RBCGF drugs.

The next reference to monopolization of RBCGF sales is found only in a heading, not in a factual, numbered paragraph.  Compl. sub-heading IV. C. states that "Amgen Has Monopolized The Sales Of RBCGF Drugs To Oncology Clinics By Leveraging Its WBCGF Monopoly."  The factual paragraphs under this subheading (Compl. ¶¶ 27-38), however, make no further reference to any monopoly in the sale of RBCGF.  Finally, the last reference to any such alleged monopoly occurs in Paragraph 84, which states the following conclusion: "Amgen achieved a monopoly in the sales of RBCGF to oncology clinics . . . ."  These haphazard references to a supposed RBCGF monopoly are inadequate to state a claim for relief.

To state a claim for monopolization, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."  Schuylkill Energy Resources v. Pennsylvania Power & Light Co., 113 F.3d 405, 412-13 (3d Cir.), cert. denied, 522 U.S. 977 (1997).  The Complaint contains no explicit allegation that Amgen possesses monopoly power in the RBCGF oncology

---

this case.  Regardless of how this Court disposes of the remainder of this motion, Plaintiff's reckless and cryptic allegation of some sort of "conspiracy" between Defendants and unnamed "co-conspirators" "fixing, controlling and/or maintaining" price should be stricken.

clinic "market."  Plaintiff's monopolization claim is, therefore, plainly deficient on its face and should be dismissed.[19]

Even if the Court were indulgent of Plaintiff's failure explicitly to plead monopoly power, there are insufficient facts pled in the Complaint from which monopoly power could be inferred.  While monopoly power may sometimes be inferred from a dominant market share **plus** other facts suggesting that that share has given rise to monopoly power, the Complaint is clearly insufficient to raise such an inference here.  First, the highest RBCGF market share alleged in the complaint, 66%, is about in the range that the Supreme Court has characterized as doubtfully giving rise to monopoly power.  United States v. Aluminum Co. of America (ALCOA), 148 F.2d 416, 424 (2d Cir. 1945) ("[O]ver ninety [percent] . . . is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough . . . .").[20]  Moreover, this border-line market share is not accompanied by the other factual allegations necessary to infer monopoly power from a high market share.  The Third Circuit has held:  "A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme.  The plaintiff must show that new rivals are barred from entering the market **and show that existing competitors lack the capacity to expand their output** . . . ."  Handicomp v. USGA, 2000 WL 426245 (3d Cir. 2000) (emphasis added) (quoting American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'n, Inc., 108 F.3d 1147, 1154 (9th Cir. 1997)); see also Barr Labs., Inc. v. Abbott Labs., Inc., 978 F.2d 98, 112 (3d Cir.1992) ("[M]arket share indicates market power only when sales reflect control of the productive assets in the business . . . [and thus] ability to curtail total market output.") (quoting

---

[19] Plaintiff's allegation of a relevant product market limited to only oncology clinic buyers is also legally improper.  E.g., T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 828 (11th Cir. 1991); Lockheed Martin Corp. v. Boeing, 314 F. Supp. 2d 1198, 1229 (M.D. Fla. 2004).  Insofar as Plaintiff fails to plead that Amgen has monopoly power even within the market that Plaintiff defines, the relevant market issue need not be reached.

[20] Although ALCOA was decided by the Second Circuit, that Court was sitting as the Supreme Court by special act of Congress because conflicts of interest prevented a quorum of the Supreme Court from hearing the case.  See ALCOA, 148 F.2d at 421.

Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1414 (7th Cir. 1989)); Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.), cert. denied, 516 U.S. 987 (1985) (inability of existing competitors to expand output is a necessary prerequisite to inferring monopoly power from high market share).

Here, while the Complaint contains allegations concerning barriers to entry by new rivals, it contains no allegation that Amgen's existing rival, Ortho, lacks the capacity to expand output. In fact, the specific facts alleged in the Complaint raise precisely the opposite inference. The Complaint discloses that (1) from the introduction of RBCGF until 2001, Ortho enjoyed a complete monopoly; (2) as recently as 2004, Ortho had a market share of over 50% in the oncology clinic "market;" and (3) Ortho has a 70% share of RBCGF sales through retail pharmacies. Compl. ¶¶ 4, 18-20, 38. Each of these facts strongly negate any inference that Ortho lacks the capacity to increase output.

Moreover, the Complaint alleges that Ortho remains "an equally efficient competitor." Compl. ¶ 54. This allegation also negates any inference that Amgen's market share has resulted in the acquisition of monopoly power. A key reason why a supplier's size in relationship to its competitors may sometimes yield an inference of monopoly power is that the larger supplier may be able to achieve efficiencies of scale that drive its per unit costs down to a level with which its rivals cannot compete.[21] Here, the Complaint alleges that Ortho makes 1 out of every 3 sales of

---

[21] In the tying context, for example, Areeda & Hovenkamp explain under what circumstances tying forecloses enough of the tied market to raise tied-market monopoly concerns: "Though all the nonforeclosed users in such a market buy from a second producer, their patronage could be too small to support operations at minimum efficient scale. Operating below that scale might elevate the second producer's unit cost far above those of the tying seller . . . . Such factors are not captured by the mere market share of the foreclosure." Antitrust Law ¶ 1704b2, at 48-49; see also Craftsman Limousine, Inc. v. Ford Motor Co., 491 F.3d 380, 392-93 (8th Cir. 2007) (listing small minimum efficient scale in an industry as a factor weighing against a finding of market power). Here, SMW Health Fund alleges only that Amgen has a borderline-high market share. Not only do the facts in the Complaint raise no inference that the share left for Ortho is below "minimum efficient scale," but Plaintiff has explicitly pled that Ortho remains "equally efficient." Thus, Plaintiff itself has pled that Amgen's high market share has not given rise to enough foreclosure to yield monopoly power.

RBCGF to oncology clinics and remains "an equally efficient competitor." Thus, the Complaint is explicit that Amgen's market share in relationship to Ortho has **not** provided Amgen with better efficiencies of scale.

In summary, Plaintiff's failure to explicitly allege that Amgen possesses monopoly power in the RBCGF oncology clinic "market" is a fatal failure to allege an essential element of a monopolization claim, thus requiring dismissal. Moreover, Plaintiff's bare allegations of a 66% market share and barriers to entry by new rivals are insufficient to allow a plausible inference of monopoly power, where, as here, Plaintiff has alleged the presence of a significant, equally efficient, existing rival without any allegation that that rival lacks the capacity to expand its output. Accordingly, Plaintiff has failed to state a claim for monopolization.[22]

**POINT III**

**PLAINTIFF'S TYING CLAIM FAILS AS A MATTER OF LAW BECAUSE AMGEN DOES NOT SELL ITS WBCGF PRODUCTS ONLY ON CONDITION THAT THE ONCOLOGY CLINICS BUY ARANESP®.**

Apart from monopolization, Plaintiff's alternative theory of antitrust liability is its allegation that Amgen's program of bundled discounts constitutes unlawful tying. Plaintiff does not allege, however, that Amgen will sell the tying product (WBCGF) only on condition that the clinics purchase Aranesp®. See also Ortho Biotech Prods. v. Amgen Inc., Civ. Act. No. 05-4859, slip op. at 7 (D.N.J. Nov. 21, 2006) ("No clinic was required to purchase Aranesp in order to purchase Amgen's WBCGF products."). In the Third Circuit, the separate availability of the tying product is fatal as a matter of law to a tying claim.

---

[22] In Paragraph 107 of the Complaint, in the midst of Plaintiff's "Second Claim for Relief," Plaintiff makes reference to "the aforesaid monopolization and attempted monopolization." The Complaint makes no allegation of an attempt to monopolize beyond this odd-ball reference. In any event, a claim for attempted monopolization requires an allegation of dangerous probability of a monopoly, which allegation is absent from the Complaint. E.g., Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993).

- 24 -

To establish unlawful tying, a plaintiff must show at least that (1) the defendant conditioned the sale of one product on the purchase of another product; (2) the defendant has sufficient economic power over the tying products to restrain trade in the market for those products; and (3) a not insubstantial amount of commerce is affected by the arrangement.  See SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089, 1112-13 (E.D. Pa. 1976), aff'd, 575 F.2d 1056 (3d Cir. 1978).  Plaintiff's failure to allege the first of these elements defeats its tying claim as a matter of law.

To prove the conditioned sale element of a tying arrangement, a plaintiff must establish the presence of "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."  SmithKline, 575 F.2d at 1061 n.3 (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958)).  Failure to allege or prove a conditioned sale requires dismissal.  See SmithKline, 427 F. Supp. at 1112-13; see also Broadcom Corp. v. Qualcomm Inc., 2006 U.S. Dist. LEXIS 62090, at *43-47 (D.N.J. 2006), rev'd on other grounds, 501 F.3d 297 (3d Cir. 2007) (tying dismissal not appealed).  The refusal to sell the tying product independently of the tied product need not be embodied in an express contractual provision, but there must be a complete refusal to sell the tying product absent purchase of the tied product. See SmithKline, 427 F. Supp. at 1112-13, aff'd, 575 F.2d 1056, 1061 n.3; see also Schor v. Abbott Labs., Inc., 457 F.3d 608, 610 (7th Cir. 2006) ("[T]his is not a tie-in because [the tying product] is available separately . . . .  Abbott will sell [the tying product] to anyone willing to pay its price: there is no refusal to deal."), cert. denied, 127 S. Ct. 1257 (2007).

Plaintiff's Complaint does not dispute that Amgen is willing to sell WBCGF to customers that purchase no Aranesp®.  Plaintiff instead challenges the *discounts* on WBCGF products that Amgen offers to customers that meet purchasing targets on Aranesp®.  SmithKline, however, rejected just such an alleged tying claim involving a bundled discount arrangement.  In SmithKline, the district court found that defendant Eli Lilly's bundled rebate program did not constitute an illegal tying arrangement because there was no outright refusal to sell the alleged tying product.  The program at issue provided customers with incremental rebates based on their

- 25 -

total quarterly purchases of all five of Eli Lilly's cephalosporin products, including two in which Lilly held exclusive patent rights, Keflin and Keflex.  SmithKline, 427 F. Supp. at 1105, 1106. In addition, the program offered additional rebates if hospital customers purchased established minimum quantities of each of any three of Lilly's five products.  SmithKline, 427 F. Supp. at 1105.  Lilly anticipated that, as a practical matter, virtually all hospitals would purchase the minimum quantities of its two patented products, Keflin and Keflex, along with Kefzol, which competed with SmithKline's cephalosporin product Ancef.  SmithKline, 427 F. Supp. at 1106.

SmithKline argued that Lilly's program had the practical effect of tying the sale of Kefzol (the alleged tied product) to Keflin and Keflex (the alleged tying products, on which SmithKline had a monopoly).  SmithKline, 427 F. Supp. at 1110.  While the court did not disagree that Lilly's program had a practical effect similar to that of tying, see 427 F. Supp. at 1107-09, the court nevertheless rejected SmithKline's tying claim because Eli Lilly would sell its "tying" product to customers that did not buy its "tied" product.  See SmithKline, 427 F. Supp. at 1113. In doing so, the court clearly articulated the applicable legal rule: "The court can find the existence of an illegal tie-in *only if* SmithKline demonstrated that Lilly refused to sell Keflin and/or Keflex [the "tying" products] separately, but *only* sold those desired products upon the condition that a hospital purchase one of Lilly's cephalosporin products. . . ."  SmithKline, 427 F. Supp. at 1113 (emphasis added).  The court cited the Supreme Court's decision in N. Pac. Ry. Co. v. United States, 356 U.S. 1, 6 n.4 (1958):  "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."  Accordingly, notwithstanding SmithKline's arguments concerning the discount program's practical effect, and notwithstanding the court's recognition that the program had that effect, the court rejected the tying claim as a matter of law.

On appeal, the Third Circuit agreed that the challenged program was not a tie:

> Lilly did not condition the availability of any of its products on the purchase of any other of its products or on the refusal of purchasing hospitals to deal with its competitors.  Thus, Lilly did not 'tie' purchases of Kefzol to purchases of Keflin or Keflex.  We accept the decision of the district court that, in the absence of such

- 26 -

> a requirement, there is no illegal tie-in. . . .  Lilly's marketing scheme lacks the
> element of coercion necessary for liability under the theory of tie-ins.

SmithKline, 575 F.2d at 1061 n.3.[23]  Thus, SmithKline establishes a rule in this Circuit that, as a

matter of law, where a party is willing to sell its alleged tying product to customers who do not

purchase its allegedly tied product, the conditioning of discounts or rebates on the "tying"

product based upon minimum purchases of the "tied" product will not support a tying claim.

    This Court has consistently applied the SmithKline rule.  In Innovation Data Processing,

Inc. v. IBM, plaintiff complained that defendant IBM violated tying law by bundling an

operating system program with a data manipulation program ("DFDSS") that competed with

Innovation's own data manipulation program.  585 F. Supp. 1470, 1474 (D.N.J. 1984).  Judge

Ackerman rejected plaintiff's claim as a matter of law and granted summary judgment to IBM

because IBM offered the two programs separately.  See Innovation Data, 585 F. Supp. at 1475

("I conclude that here IBM customers are . . . free to take either the DFDSS program or the IPO

'J' by itself and that on this basis alone there is no illegal tying arrangement.").  The Court held,

> [A]s a matter of law, in the absence of evidence that the purchase of the alleged
> tied product was required as a condition of sale of the alleged tying product—
> rather than merely as a prerequisite for practical and effective use of the tying
> product—Innovation has failed to show the requisite coercion necessary to
> establish a per se illegal tying arrangement.

Innovation Data, 585 F. Supp. at 1475.

    More recently, in Broadcom Corp. v. Qualcomm Inc., 2006 U.S. Dist. LEXIS 62090, at

*43-47 (D.N.J. 2006), rev'd on other grounds, 501 F.3d 297 (3d Cir. 2007) (tying dismissal not

appealed), this Court again applied SmithKline to dismiss tying claims involving bundled

discounts.  In Broadcom, Judge Cooper found that SmithKline mandated the dismissal of a tying

claim when the conduct alleged is the conditioning of discounts or rebates, rather than a refusal

to sell the tying product.  The Court held that Qualcomm's program of offering discounts on its

patent licenses only to customers who purchase its UMTS chipsets was not a tying arrangement.

_____

[23] While SmithKline did not appeal the dismissal of its Section 1 tying claim, the Third Circuit
explicitly endorsed the district court's holding on that issue in the quoted passage.

See id. at *44, *46-47.  Broadcom was a competitor to Qualcomm in UMTS chipsets, which are necessary to operate third-generation WCDMA cell phone technology.  Id. at *5.  Qualcomm held patents that are essential to that new technology.  Id. at *5.  Broadcom alleged that Qualcomm's practice of conditioning discounts on its patented technology (the alleged tying product) based on a customer purchasing specified amounts of its UMTS chipsets (the alleged tied product) (1) strongly discouraged chipset buyers from dealing with Qualcomm competitors; (2) made meaningful competition impossible, and (3) amounted to economic coercion.  Id. at *43.  Accepting those allegations as true for purposes of the 12(b)(6) motion, the Court applied the SmithKline rule and dismissed the tying claim as a matter of law because conditioned discounts are not equivalent to a refusal to sell the tying product:  "Qualcomm's decision to offer discounts to licensees who purchase Qualcomm chipsets may make the purchase of Qualcomm chipsets a more economically viable option for those licensees.  Such an incentive, however, does not amount to a forced sale."  Id. at *44.

   As this Court has already found, and as the Complaint does not dispute, Amgen is willing to sell WBCGF to clinics that choose not to purchase any Aranesp®.  Ortho Biotech Prods. v. Amgen Inc., Civ. Act. No. 05-4859, slip op. at 7 (D.N.J. Nov. 21, 2006) ("No clinic was required to purchase Aranesp® in order to purchase Amgen's WBCGF products.").  Therefore, under established Third Circuit law, Plaintiff's tying claim fails as a matter of law and should be dismissed.

**POINT IV**

**PLAINTIFFS MAY NOT PURSUE CLAIMS BASED ON INTERSTATE ACTIVITY UNDER CERTAIN STATE ANTITRUST LAWS.**

   Plaintiff alleges conduct that is interstate in its nature and effects.  The complaint describes the geographic market as "oncology clinics across the country," claims nationwide injuries and seeks certification of a nationwide class.  The reach of several state statutes invoked by Plaintiff in the Complaint, however, is limited to conduct that is predominantly intrastate in

- 28 -

scope.  See La. Rev. Stat. Ann. § 51:122-123 (1987); Al Copeland Enters. v. Jamplis, No. 90-4902, 1991 WL 49651, at *5 (E.D. La. Apr. 3, 1991) ("Louisiana antitrust laws do not apply to interstate commerce, and [plaintiffs] have not alleged any violations occurring in intrastate commerce"); English v. NCAA, 439 So.2d 1218, 1223 (La. Ct. App. 1983); MASS. GEN. LAWS ANN. Ch. 93, § 3 (West 1994) ("their competitive impact primarily and predominantly within the commonwealth and at most, only incidentally outside New England."); Aurora Cable Communications, Inc. v. Jones Intercable, Inc., 720 F. Supp. 600, 603 (W.D. Mich. 1989); cf. Peoples Savs. Bank v. Stoddard, 102 N.W.2d 777, 796 (Mich. 1960)(noting that comparable prior version of Michigan statute did not conflict with federal statutes because conduct regulated was "predominately local in its effect"); Lynch Display Corp. v. Nat'l Souvenir Ctr. Inc., 640 S.W.2d 837, 840 (Tenn. Ct. App. 1982); Duke v. Browning-Ferris Indus., Inc., No. 96-2859-TUA, 1996 U.S. Dist. LEXIS 20769, at *7 (W.D. Tenn. Oct. 22, 1996) ("statute only applies if the action is predominately intrastate"); accord Freeman Industries LLC v. Eastman Chemical Co., 172 S.W.3d 512, 524 (Tenn. 2005) (focusing on "effects of conduct on Tennessee commerce"); ex rel Palumbo v. Graley's Body Shop, Inc., 425 S.E.2d 177, 183 n.11 (W. Va. 1992); Anziulewicz v. Bluefield Cmty. Hosp., Inc., 531 F. Supp. 49, 53 (S.D. W.Va. 1981); Pulp Wood Co. v. Green Bay Paper & Fiber Co., 147 N.W. 1058 (Wis. 1914); Grams v. Boss, 294 N.W.2d 473, 480 (Wis. 1980) ("We have repeatedly held stated that § 133.01 [applies]…to intrastate as distinguished from interstate transactions"); State v. Waste Mgmt., 261 N.W.2d 147,155 (Wis. 1978) ("The state [antitrust] act applies to intrastate commerce while the federal act applies to interstate commerce."). Therefore, even if the Complaint were to survive the various other infirmities raised above, Plaintiff's claims under the statutes of Louisiana, Massachusetts, Michigan, Tennessee, West Virginia, and Wisconsin should be dismissed.[24]

---

[24] Amgen does not concede that the remaining states' antitrust statutes can properly be applied to reach the interstate activity at issue here, and reserves the right to challenge their applicability at a later, appropriate time.

## **CONCLUSION**

For the reasons described in Point I, Plaintiff has failed to plead injury-in-fact and therefore lacks both Article III standing and antitrust standing to proceed with this action. The Complaint, therefore, should be dismissed for lack of subject matter jurisdiction and for failure to state a claim. Even if the Court were to find injury-in-fact adequately pled, the Complaint has other antitrust standing and antitrust merits infirmities that require its dismissal. Accordingly, Amgen respectfully requests that the Court enter an Order dismissing the Complaint in its entirety.

Dated:  January 18, 2008                                Respectfully submitted,

                                                        **GIBBONS P.C.**
On the Brief:                                           Attorneys for Defendants
    Guy V. Amoresano                           Amgen Inc. and Amgen USA Inc.
    Jennifer A. Hradil

Of Counsel:                                             By:_____
    Anna S. Richo, Esq.                                     Michael R. Griffinger
    Mary Beth Cantrell, Esq.                                Michael F. Quinn
    Moze Cowper, Esq.